[Nos. D004633, D004634. Fourth Dist., Div. One. Dec. 9, 1987.]

In re the Marriage of NANCY MARIE and LARRY PHILLIP HATTIS.
NANCY MARIE HATTIS, Respondent, v.
LARRY PHILLIP HATTIS, Appellant.

**COUNSEL**

Gerald F. McGhee for Appellant.

Steven R. Striker for Respondent.

**OPINION**

WIENER, Acting P. J.—These two cases consolidated on appeal[1] raise the propriety of California jurisdiction over a nonresident defendant in an action to partition a military pension and in a separate action to recognize, establish arrearages on and modify a sister state judgment awarding child support. Since personal jurisdiction analysis required under 10 United States Code section 1408(c)(4) for the partition of the pension differs from the constitutional "minimum contacts" approach applicable to the action on the child support order, we reach different results under the two tests. ■ ■ fn. ■ For reasons set forth below, we will issue a writ of mandate[2] to prevent the trial court from exercising jurisdiction in the pension action. However, the writ is denied as to the child support case and the court may properly proceed to decide those issues.

FACTUAL AND PROCEDURAL BACKGROUND

Larry Phillip Hattis (Larry) and Nancy Marie Hattis (Nancy) were married in San Diego on June 28, 1969. Larry, an employee of the United States Navy, was transferred to Michigan shortly thereafter where their first child was born. Larry and Nancy returned to San Diego by way of military assignment in 1971. A second child was born in California before Larry was

---

[1] The court, on its own motion, consolidated the two cases for oral argument and decision in an order filed June 4, 1987.

[2] Larry Hattis purports to appeal from two orders denying his motions to quash service of summons for lack of jurisdiction. The orders are nonappealable under Code of Civil Procedure section 904.1. (3 Markey, Cal. Family Law (1978) § 49.11 [7][c], pp. 49-56.1.) Since the jurisdictional issue has been fully briefed and Nancy Hattis is not questioning the propriety of this appeal, we treat the appeal as a petition for writ of mandate. (See *Estate of Hoertkorn* (1979) 88 Cal.App.3d 461, 463 [151 Cal.Rptr. 806]; *U.S. Financial* v. *Sullivan* (1974) 37 Cal.App.3d 5, 11-12 [112 Cal.Rptr. 18]; *Varra* v. *Superior Court* (1960) 181 Cal.App.2d 12 [4 Cal.Rptr. 920].)

again transferred in 1974, this time to Illinois. The couple returned to San Diego in January of 1978. In 1979, the parties separated and Nancy received "public assistance."

On November 26, 1979, Larry filed for dissolution of the marriage in San Diego Superior Court.[3] No further action was taken in the San Diego dissolution action. In September 1981 Larry was transferred to Georgia. He induced Nancy to move with him to Georgia to attempt to reconcile the marriage. Larry left Nancy and the two children at his parents' home in Michigan and went on to Georgia to find a residence. When Nancy traveled to Georgia to check on his progress, Larry informed her that the marriage was over and that he intended to file for divorce in Georgia.

Larry employed legal counsel and filed for divorce in Georgia on January 1, 1982. Nancy, unrepresented by counsel, stayed in Georgia for one and one-half months in order to sign the child custody order and property settlement agreement. No spousal support was awarded and no mention of the military pension was made.

Nancy returned to San Diego in February 1982 and the children joined her in June. Nancy could only find part-time employment and resided with her parents. Due to financial and housing difficulties, she returned the children to Larry in the latter part of the summer of 1982. Larry returned nine-year-old Jerry to Nancy in November of 1982. He sent 15-year-old Elizabeth back to California in September of 1985. During the period from November 1982 to October 1985 Larry paid only $200 in child support.[4] His failure to provide the required support payments forced Nancy to obtain financial assistance from California sources.[5] In addition, she applied for and received Medi-Cal payments on behalf of her son.

On December 30, 1985, Nancy filed a complaint to partition her interest in Larry's military pension. On January 10, 1986, she filed a complaint to establish the sister state judgment (Georgia) and to modify the provisions for child support. Larry's motions to quash service of summons in each

[3] We take judicial notice of San Diego Superior Court file No. D145881 under Evidence Code section 452, subdivision (d). In the petition, Larry cited irreconcilable differences under Civil Code section 4506, subdivision (1), and stated under penalty of perjury that he had been a resident of the state for at least six months. As used in the petition, "resident" is synonymous with domiciliary. (*Whealton* v. *Whealton* (1967) 67 Cal.2d 656, 660 [63 Cal.Rptr. 291, 432 P.2d 979].)

[4] The Georgia decree provides for child support in the amount of $100 per child per month or $200. After the present action was commenced, Nancy began receiving the $200 monthly payments.

[5] Nancy's parents were forced to support Nancy and the children. (See generally *McGlothen* v. *Superior Court* (1981) 121 Cal.App.3d 106, 113 [175 Cal.Rptr. 129].)

action were denied. The trial court found sufficient facts in each case to confer jurisdiction.

DISCUSSION

I

 The issue in both cases is whether the trial court properly exercised personal jurisdiction over nonresident Larry in the proceedings below. We first address the action to partition the military pension (D004633).

Nancy argues the trial court may assert jurisdiction under 10 United States Code section 1408(c)(4) or in the alternative, under California's Long-arm Statute, Code of Civil Procedure section 410.10. Her contention is erroneous.

Congress enacted the Federal Uniformed Services Former Spouses Protection Act (FUSFSPA), 10 United States Code section 1408, in response to the United States Supreme Court ruling in *McCarty* v. *McCarty* (1981) 453 U.S. 210 [69 L.Ed.2d 589, 101 S.Ct. 2728]. *McCarty* held that under the Supremacy Clause of the United States Constitution (art. VI, cl. 2), a state court was impliedly preempted from utilizing community property laws to divide a military pension. By its enactment of FUSFSPA, Congress provided otherwise. (See generally *Casas* v. *Thompson* (1986) 42 Cal.3d 131, 139-140, 144-145 [228 Cal.Rptr. 33, 720 P.2d 921].) Section 1408(c)(4), the jurisdictional subsection, was apparently included in response to concerns about "forum-shopping" spouses who might seek to divide the pension in a state with more favorable laws, but with little contact with the pensioner. (See H.Conf. Rep. No. 97-749 and Sen. Rep. No. 97-502, 2d Sess., reprinted in 1982 U.S. Code Cong. & Admin. News, No. 3, at pp. 1571, 1603-1604, 1635, 1639-1640.) Congress narrowed the jurisdictional possibilities to the military spouse's: (a) residence other than by military assignment; (b) domicile; or (c) consent. The "minimum contacts" option is conspicuously and, we suspect, purposefully absent.

The "minimum contacts" test arises under state law, in this case Code of Civil Procedure section 410.10. When a state law interferes with or is contrary to federal law, the state law must yield. (U.S. Const., art. VI, cl. 2; *Free* v. *Bland* (1962) 369 U.S. 663 [8 L.Ed.2d 180, 82 S.Ct. 1089].) **(3)** Thus here, "minimum contacts" will not sustain jurisdiction when Congress has expressly dictated a more restrictive standard under 10 United States Code section 1408(c)(4). Jurisdiction to divide a military pension is now limited. (*Tarvin* v. *Tarvin* (1986) 187 Cal.App.3d 56 [232 Cal.Rptr. 13].)

██ Only three possible bases exist for personal jurisdiction under 10 United States Code section 1408(c)(4). First, it is clear that Larry did not consent to jurisdiction in this case. Under section 1408(c)(4)(B), Larry only resided here pursuant to military assignment, not of his own volition. That leaves "domicile" as the only possible basis for statutory jurisdiction. ██ ██ fn. ██ ██ Nancy concedes that Larry is not now domiciled in California and was not a domiciliary of the state at the time her partition action was filed.[6] She relies, however, on the express finding by the trial court that she and Larry were domiciled in California for eight years of their twelve-year marriage and argues that *past* domicile may be sufficient to satisfy the statutory jurisdictional requirements if that past domicile is sufficiently connected to the subject of litigation.

*Tarvin* v. *Tarvin, supra,* 187 Cal.App.3d 56 appears at first blush to categorically reject Nancy's argument. (See Hogoboom & King, Cal. Practice Guide: Family Law (1987) § 8:55.13a, p. 8-45.) Considering a similar argument, the *Tarvin* court explained as follows: "Nor can the FUSFSPA requirement of domicile or residency be met by looking at the defendant-husband's *past* residency. As our high court cautioned: 'the mere fact of past domicile in the state would not subject [the defendant] to its jurisdiction indefinitely, for a past domicile having no relationship to the litigation at hand would not afford a reasonable basis for an assertion of jurisdiction.' (*Owens* v. *Superior Court* (1959) 52 Cal.2d 822, 829 [345 P.2d 921, 78 A.L.R.2d 388].) [¶] Here, the only connection between husband's past residency in California and the pending partition action is remote and indirect: in the California dissolution action, husband failed to list his military pension as a community asset. But wife, too, omitted the asset. Moreover, husband's pension rights did not mature during his brief California residency. Husband's past domicile cannot subject him to California's jurisdiction now." (187 Cal.App.3d at p. 61.)

On closer inspection, however, *Tarvin* fails to sufficiently distinguish two sets of concepts, creating ambiguities which leave the issue arguably

---

[6] We have no quarrel with the suggestion in the concurring and dissenting opinion that an established domicile will be presumed to have continued in the absence of contrary proof. For FUSFSPA as well as other purposes, a member of the armed services must always have a domicile in which he or she can be sued. Often, domicile is the state from which the service member entered the military although, as in this case (*ante,* fn. 3), a service member can acquire new domiciles while on active duty. (See *In re Marriage of Thornton* (1982) 135 Cal.App.3d 500, 508-510 [185 Cal.Rptr. 388].)

Here, Larry's 1979 admission of a California domicile would support a present and continuing California domicile only if Larry could not demonstrate that his domicile had changed. We view Nancy's concession of the issue, however, as determinative. (Quoted in conc. and dis. opn., *post* at p. 1177.) The fact that she is confused as to where Larry's current domicile is does not mean her concession it is *not* in California is invalid.

unsettled. To begin with, *Tarvin* treats residency and domicile interchangeably when FUSFSPA makes clear they are distinct concepts for the purposes of that statute. (See *In re Marriage of Thornton, supra,* 135 Cal.App.3d 500, 507-508; see generally *Smith* v. *Smith* (1955) 45 Cal.2d 235, 239 [288 P.2d 497].) More importantly, *Tarvin* cites *Owens* v. *Superior Court* and its discussion of the need for a relationship between past domicile and the "litigation at hand." *Owens,* however, is a minimum contacts case. Utilizing a minimum contacts analysis, the court in *Owens* quite appropriately rejected the suggestion that past domicile without more could support the assertion of jurisdiction. But *Owens* has no application to FUSFSPA, which expressly rejects the minimum contacts approach. Yet by citing and discussing *Owens, Tarvin* suggests by negative implication that past domicile with sufficient relationship to the partition action might satisfy FUSFSPA's jurisdictional requirements.

The question presented is principally one of assessing Congressional intent. Although FUSFSPA's legislative history in this regard is far from bountiful, the jurisdictional prerequisites of section 1408(c)(4) appear to have been part of a series of House amendments to the original Senate bill. (See H.Conf. Rep. No. 97-749, 2d Sess., reprinted in 1982 U.S. Code Cong. & Admin. News, No. 3, at p. 1571.) The only concerns expressed regarding jurisdiction in the Senate hearings came from representatives of the Marine Corps and Air Force. Significantly, the deputy chiefs of staff for manpower from each of those service branches testified before the Senate and recommended that FUSFSPA jurisdiction be limited to the state "in which the member *is* domiciled . . . ." (Sen. Rep. No. 97-502, 2d Sess., reprinted in 1982 U.S. Code Cong. & Admin. News, No. 3, at p. 1635 (statement of Lt. Gen. Edward J. Bronars, U.S.M.C.) and p. 1640 (statement of Lt. Gen. Andrew P. Iosue, U.S.A.F.) (italics added).)

We are aware of two decisions from other states which indirectly consider the question of whether past domicile can satisfy FUSFSPA's jurisdictional prerequisites. Both impliedly conclude that FUSFSPA's reference to "domicile" was intended by Congress to be "present domicile." In *Sparks* v. *Caldwell* (1986) 104 N.M. 475 [723 P.2d 244], husband and wife were divorced in New Mexico; husband thereafter moved to Washington. Wife then brought a partition action in New Mexico to obtain her interest in husband's omitted military pension. Concluding there was no jurisdiction under FUSFSPA, the court explained: "[P]etitioner is not presently and was not at the time [the partition action] was filed, a resident or domiciliary of New Mexico, . . . ." (*Id.* at p. 245.) In *Gowins* v. *Gowins* (La. 1985) 466 So.2d 32, husband and wife were married in Louisiana and were living there when husband joined the Air Force. At the time of their divorce after a 16-year marriage, husband admitted being a Louisiana domiciliary stationed in

South Dakota. Four years later, wife filed a pension partition action in which she alleged that husband was a former domiciliary of Louisiana now residing in Alabama. Rejecting husband's challenge to jurisdiction based on FUSFSPA, the court relied on a presumption against a change in domicile: "In her petition for partition, Mrs. Gowins states that Col. Gowins is a *former* or past domiciliary of Louisiana. . . . This does not preclude the conclusion that he is a present domiciliary of Louisiana, *giving jurisdiction under 10 U.S.C.A. § 1408(c)(4)(B)*. There is no evidence to rebut the presumption that Col. Gowins maintains the Louisiana domicile, which he had when he joined the Air Force." (*Id.* at p. 36, second italics added.)

Our fundamental concern with Nancy's argument is that it effectively engrafts a "minimum contacts" analysis onto a statute which necessarily rejected that jurisdictional approach. Under Nancy's theory, determining whether past domicile was transactionally related would closely approximate the minimum contacts analysis which is applied to determine whether "the particular cause of action [arises] out of or [is] connected with the defendant's forum-related activity." (*Buckeye Boiler Co.* v. *Superior Court* (1969) 71 Cal.2d 893, 899 [80 Cal.Rptr. 113, 458 P.2d 57].) We agree there are strong arguments to commend the flexible minimum contacts approach in preference to the wooden limitations imposed by FUSFSPA. The rights accorded by FUSFSPA to the spouses of military personnel may ring hollow if it is impossible or prohibitively expensive to enforce them. Rarely is the non-military spouse more capable of litigating away from home. To the extent the "forum shopping" concerns expressed during the FUSFSPA hearings are legitimate, they could have been dealt with by simply providing in the statute that residence solely by virtue of military assignment is not to be considered in assessing minimum contacts for jurisdictional purposes. Moreover, it makes no sense to have different jurisdictional criteria applicable to related issues in the same litigation. Here, for instance, a minimum contacts approach will support California jurisdiction over Larry for the purposes of determining his liability for child support (see *post*, pp. 1173-1175) but that same court cannot adjudicate the division of his military pension, even if California law would apply under a choice of law analysis.

But our function is not to judge the wisdom of the United States Congress. Viewed in context, FUSFSPA clearly rejects the flexible minimum contacts approach in favor of three defined jurisdictional categories. Since none of the three possible bases for jurisdiction can be satisfied in this case, the trial court exceeded its authority in finding personal jurisdiction over Larry. For that reason, a writ of mandate is proper to prevent the trial court from asserting jurisdiction in the partition action. (*Varra* v. *Superior Court, supra,* 181 Cal.App.2d 12.)

## II

■ Turning to the second action, the trial court properly established the Georgia decree as a California judgment. Judgments of another state must be given full faith and credit under article IV, clause 1 of the United States Constitution if final and rendered by a court of competent jurisdiction. (*Biewend* v. *Biewend* (1941) 17 Cal.2d 108 [109 P.2d 701, 132 A.L.R. 1264], disapproved on other grounds in *Worthley* v. *Worthley* (1955) 44 Cal.2d 465, 470 [283 P.2d 19].) Exhibit "A" to the complaint indicates that the Georgia decree was final on July 19, 1982. Larry did not challenge the validity of the Georgia decree. Therefore the Georgia decree can be established as the California judgment.

■ The next question is whether the trial court can exercise personal jurisdiction over Larry to issue an order to show cause for modification of child support, setting of arrearages, and attorney's fees and costs. California courts may exercise jurisdiction "on any basis not inconsistent with the Constitution of this state or of the United States." (Code Civ. Proc., § 410.10.) The relevant inquiry in this case is whether Larry has sufficient "minimum contacts" with the state to make the exercise of jurisdiction reasonable.

■ The "minimum contacts" test was first announced in *Internat. Shoe Co.* v. *Washington* (1945) 326 U.S. 310 [90 L.Ed. 95, 66 S.Ct. 154, 161 A.L.R. 1057]. Due process requires that a defendant have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" (*Id.* at p. 316 [90 L.Ed. at p. 102].) The test was modified in *Hanson* v. *Denckla* (1958) 357 U.S. 235, 253 [2 L.Ed.2d 1283, 1298, 78 S.Ct. 1228]: "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." (See also *Shaffer* v. *Heitner* (1977) 433 U.S. 186, 216 [53 L.Ed.2d 683, 705, 97 S.Ct. 2569].)

The minimum contacts test for personal jurisdiction in the family law context was clarified in *Kulko* v. *California Superior Court* (1978) 436 U.S. 84 [56 L.Ed.2d 132, 98 S.Ct. 1690]. In *Kulko* both parties were residents and domiciliaries of New York although they were married in California during a three-day stop. (*Id.* at p. 86 [56 L.Ed.2d at p. 138].) Their children were born in New York. Following separation, Sharon Kulko moved to California. A separation agreement was drawn up in New York and Sharon flew back to sign it. The agreement provided in part that the children would remain with the father during the school year, but spend vacations with the

mother in California. The agreement was incorporated into a Haitian divorce decree. A year after the divorce the daughter asked her father if she could live with her mother. The father acquiesced and purchased a one-way plane ticket for California for his daughter. Two years later, the son moved to California. Sharon Kulko then sought to establish the Haitian decree as a California judgment, to gain full custody of the children and to increase the child support obligations of the father. (*Id*. at p. 88 [56 L.Ed.2d at pp. 138-139].)

The California courts upheld jurisdiction over the father because of his "purposeful act" of consenting to the daughter's move to California and purchasing a plane ticket for that purpose. (*Id*. at p. 94 [56 L.Ed.2d at pp. 142-143].) The United States Supreme Court rejected that basis as being too tenuous to support jurisdiction. "A father who agrees, in the interests of family harmony and his children's preferences, to allow them to spend more time in California than was required under a separation agreement can hardly be said to have 'purposely availed himself' of the 'benefits and protections' of California's laws." (*Id*. at p. 94 [56 L.Ed.2d at pp. 142-143].) Therefore, assertion of jurisdiction was unreasonable.

Subsequent California cases have applied the *Kulko* rationale to uphold jurisdiction when reasonable. In *McGlothen* v. *Superior Court, supra,* 121 Cal.App.3d 106, a husband residing out of state was held subject to California jurisdiction in an action for spousal and child support. Husband Lynn was a professional baseball player who met wife Brenda, a lifelong California resident, on a road trip. The couple lived in California during the winter of 1972-73. In the spring of 1973 they moved to Boston until husband was traded to St. Louis. (*Id*. at p. 110.) In 1974 Lynn divorced his previous wife and married Brenda. The couple had a child and moved back to San Francisco when Lynn was traded in 1976.

In 1978, Lynn was traded again to Chicago. He told Brenda to move to a trailer in Louisiana until he could find a home near Chicago. After Lynn assaulted Brenda in Louisiana, he closed out their joint checking and savings accounts. (*Id*. at p. 110.) He refused to support his wife or children and Brenda was forced to return to California. She moved in with her parents and began receiving "public assistance benefits." (*Id*. at p. 111.) Relying on *In re Marriage of Lontos* (1979) 89 Cal.App.3d 61 [152 Cal.Rptr. 271] the *McGlothen* court opined: "In light of the foregoing authority, and the factual context as found in the case at bench by the superior court, it reasonably concluded that Lynn's acts and omissions outside of California were such as caused an *effect in this state* far more in the nature of *Lontos* than of *Kulko*. His wife and children, as a result of his conduct in Louisiana, were there left destitute by him and obliged to return to her parents' home in California,

where they are now supported by the taxpayers of this state or parental bounty. And they were, and are, without funds for travel to, or litigation of their right to support in, Louisiana. Moreover, Lynn may reasonably be said to have derived a *personal benefit* from their presence in this distant state, for throughout the past several years he had *not* been supporting Brenda and his children because, paraphrasing *Kulko* (436 U.S., p. 97 [56 L.Ed.2d, p. 145]) he had imposed upon Brenda, in this state, the insurmountable 'financial burden and personal strain of litigating a [spousal and] child-support suit in a forum [thousands of] miles away, . . .' " (*McGlothen* v. *Superior Court, supra,* 121 Cal.App.3d 106, 113.)

Jurisdiction to enforce a nonresident husband's support obligation was upheld on a different rationale in *Bergan* v. *Bergan* (1981) 114 Cal.App.3d 567 [170 Cal.Rptr. 751]. The court found sufficient contacts without discussing whether husband had purposely "caused an effect" in California: "Here California is both a reasonable and a fair forum for this action arising from the parties' marriage and its dissolution. California was the marital domicile. All the children of the marriage were born here. The marriage was dissolved here. The judgment of dissolution which Nora now seeks to enforce is a California judgment arising from Eldon's activities and obligations created in California." (*Id.* at pp. 570-571.)

■ The question of whether sufficient minimum contacts exist is factually dependent. The trial court must weigh the facts consistent with a two part test: "(1) Some act by which the defendant has *purposefully availed himself* of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws; and

"(2) A sufficient relationship ('nexus') between the defendant and the forum state such that it is *reasonable and fair* to require him to appear locally to conduct his defense. The determination of 'fairness' requires a *balancing* of the burden or inconvenience to the defendant against *plaintiff's interest* in obtaining effective relief, and the state's interest in adjudicating this dispute (a question which ultimately turns on the nature and quality of defendant's forum related activity)." (Hogoboom & King, Cal. Practice Guide: Family Law, *supra,* § 3:27, p. 3-11.)

In reviewing the jurisdictional facts in the proceeding below, the trial court recognized, "the rule requiring that a defendant have certain contacts with any state before it may exercise personal jurisdiction over him, is not susceptible to mechanical application. Rather, the facts of each case must be weighed to determine whether the requisite affiliating circumstances are present."

 The trial court properly exercised jurisdiction based upon the facts presented in the declarations and at trial. In many ways, this case is the reverse of *Kulko,* as if Ezra Kulko had sought to sue Sharon Kulko in New York. The Hattises met, were wed, and spent the majority of their married life in California. One of their two children was born in California. Larry worked part-time outside of the Navy and filed California tax returns. He filed for dissolution of the marriage in San Diego in 1979, acknowledging that he had been a California domiciliary for at least six months.[7] In addition, he failed to provide required support payments for his minor children, causing the State of California to provide medical care through Medi-Cal.

The trial court relied upon the "causing an effect within the state" theory to sustain the exercise of personal jurisdiction:[8] "The husband's acts in inducing his family to leave San Diego, abandoning his wife after such move, and thereafter returning the children to their home state while failing to pay any significant child support, was [*sic*] intentional. The husband's acts can most reasonably be viewed as purposeful, willful, done with full awareness and contemplation of the harm that would be effected in the state of California. [¶] The court concludes that the multiplicity of the contacts and the acts done by respondent as well as the 'effects' of the husband's acts on California point to and support California's exercise of personal jurisdiction over him."

While the continuing validity of that theory standing alone is unclear in family law cases following *Kulko* v. *California Superior Court, supra,*[9] we think it continues to be a relevant factor to be evaluated with other considerations in applying the minimum contacts test. Unlike *Kulko,* the failure to provide support payments in this case was "purposeful, willful, [and] with full awareness and contemplation of the harm that be effected in the state of

---

[7] Under Civil Code section 4530, subdivision (a) one must be a domiciliary of California for at least six months in order to file for dissolution. The term "residence" on the Judicial Council form petition requires "domicile for at least six months." (*Whealton* v. *Whealton, supra,* 67 Cal.2d 656, 660; Hogoboom & King, Cal. Practice Guide: Family Law, *supra,* § 8:55.13, p. 8-45.)

[8] The "causing an effect" theory is incorporated in California law by Judicial Council Comment to Code of Civil Procedure section 410.10 (14 West's Ann. Code Civ. Proc. (1973 ed.) p. 472), entitled "Bases of Judicial Jurisdiction over Individual . . . [¶] (9) Causing Effect in State by Act or Omission Elsewhere."

[9] In *Kulko,* the United States Supreme Court in dicta expressed concern over the validity of the "effects" test in family law cases. The court determined that the test was designed "to reach wrongful activity outside of the State causing injury within the State . . . or commercial activity affecting state residents, . . ." (436 U.S. at p. 96 [56 L.Ed.2d at p. 144].) However, the court based its rejection of personal jurisdiction upon the overall unreasonableness of asserting jurisdiction based on Kulko's limited contact with California. We therefore disagree with *Bartlett* v. *Superior Court* (1978) 86 Cal.App.3d 72, 76 [150 Cal.Rptr. 25] which completely rejects the "effects test" in family law cases. *Lontos* and *McGlothen* are examples of cases in which the overall reasonableness of asserting jurisdiction under the "effects test" makes a blanket rejection unwarranted.

California." ▇ Where the party over whom jurisdiction is asserted commits a wrongful act which impacts on minor children and a former spouse living in California, with further impact on the state's public fisc by virtue of Medi-Cal payments, consideration of the "effect" caused in California is constitutionally valid.[10] (See *McGlothen* v. *Superior Court, supra,* 121 Cal.App.3d 106 and *In re Marriage of Lontos, supra,* 89 Cal.App.3d 61.) ▇ These "effects" combined with "the multiplicity of the contacts and the acts" of Larry with the State of California more than satisfy the minimum contacts test of *Internat. Shoe Co.* v. *Washington, supra,* 326 U.S. 310 and *Kulko* v. *California Superior Court, supra,* 436 U.S. 84. The underlying principles in family law personal jurisdiction cases focus on the reasonableness of exercising jurisdiction. (See *Kulko, supra,* 436 U.S. at p. 92 [56 L.Ed.2d at p. 141].) We hold that Larry's multiple contacts with this state are sufficient to make the exercise of jurisdiction reasonable.[11]

## DISPOSITION

A writ of mandate will issue directing the trial court to quash the service of summons in the pension action. However, the decision denying the motion to quash service of summons in the child support modification action was proper and to that extent the writ is denied.

Work, J., concurred.

BENKE, J.—Although I concur with the result and reasoning in part II of the majority's opinion, I must respectfully dissent from the majority's disposition of Nancy's partition action. I believe that, on this record, Nancy may be able to establish that Larry was domiciled in California at the time the partition action was filed.

The law controlling determination of a person's domicile is well settled. (*Hawes* v. *Club Ecuestre El Comandante* (1st Cir. 1979) 598 F.2d 698, 701.) As Justice Holmes explained, "[t]he very meaning of domicil is the technically pre-eminent headquarters that every person is compelled to have in order that certain rights and duties that have been attached to it by the law

---

[10] *Kulko* attempts to distinguish cases in which a defendant's actions in one state "visited physical injury on either property or persons within the State of California." (436 U.S. at pp. 96-97 [56 L.Ed.2d at p. 144].) We cannot believe that the constitutionality of personal jurisdiction can turn on whether the failure to make support payments results in malnutrition of the children involved. In contrast to a simple modification action, a defendant who fails to make support payments has committed a wrongful act which he or she knows or should know will cause an effect in the forum state.

[11] In view of our conclusion, we find it unnecessary to reach the question whether Larry's request for a continuance constituted a general appearance voluntarily subjecting him to California jurisdiction. (See *Kulko, supra,* 436 U.S. at pp. 90-91, fn. 5 [56 L.Ed.2d 132].)

may be determined." (*Williamson* v. *Osenton* (1914) 232 U.S. 619, 625 [58 L.Ed. 758, 761, 34 S.Ct. 442, 443].) Thus while a person may, at any given time, have more than one residence, he or she may have only one domicile at a time. (*Hawes* v. *Club Ecuestre El Comandante, supra,* 598 F.2d at p. 701; Rest.2d, Conflict of Laws (1971) § 19.) In order to establish a new domicile, a person must show " '. . . (1) physical presence at the new location with (2) an intention to remain there indefinitely. . . .' " (*Scoggins* v. *Pollock* (11th Cir. 1984) 727 F.2d 1025, 1026, citing *Mas* v. *Perry* (5th Cir. 1974) 489 F.2d 1396, 1399, cert. denied (1974) 419 U.S. 842 [42 L.Ed.2d 70, 95 S.Ct. 74]; see also Rest.2d, Conflict of Laws (1971) § 18.)

More importantly, for our purposes, an established domicile is presumed to continue until a new one is acquired. (*Sadat* v. *Mertes* (7th Cir. 1980) 615 F.2d 1176, 1181; *Hawes* v. *Club Ecuestre El Comandante, supra,* 598 F.2d at p. 701; *Gowins* v. *Gowins* (La. 1985) 466 So.2d 32, 36; Rest.2d, Conflict of Laws (1971) § 19.) This presumption of continuing domicile is essential to any rational application of FUSFSPA. Under FUSFSPA the residence of a member of the military will not support a state court's jurisdiction if the residence was "because of military assignment." (10 U.S.C.A. § 1408(c)(4)(A).) Thus the residence of active duty members of the military will rarely, if ever, support a claim under FUSFSPA. This leaves jurisdiction based upon either domicile or consent. (10 U.S.C.A. § 1408(c)(4)(B), (C).) In the case of an uncooperative, but active, member of the military, *no forum* will meet the requirements of FUSFSPA unless effect is given to the presumption of a continuing domicile.

Indeed the concept of continuing domicile must of necessity be given effect if FUSFSPA is to have any logical meaning or application in the context of the case before us. In rejecting the concept of continuing domicile for purposes of FUSFSPA, we invite precisely the kind of conduct which took place below; conduct which, as the court below expressly held, saw Larry fraudulently lure his wife and children from California, where they had previously been residents and domiciliaries for approximately eight years, to another state, thereby acting to disengage any argument he was "domiciled" here in California when he filed for dissolution and when partition might first be requested. I cannot conclude *Tarvin* v. *Tarvin,* (1986) 187 Cal.App.3d 56 [232 Cal.Rptr. 13], or FUSFSPA intend such a result. GP5

Nothing in the history of FUSFSPA indicates a rejection of the long-standing continuing domicile concept. In the absence of its rejection by Congress, we must assume congressional knowledge of its existence and acceptance of its application. To the extent authority such as *Tarvin* treats

domicile and residency interchangeably to the exclusion of the concept of continuing domicile, I would respectfully part company with it.

In this case there is nothing in the record which indicates that as of December 30, 1985, when Nancy filed her partition complaint, Larry had established a new domicile in either Georgia, Illinois, Alabama or the state he now claims is his "legal residence," Michigan. In particular there is nothing which demonstrates, on or before that date, Larry's physical presence in one of those states concurrent with an intent to remain in that state indefinitely. Indeed the trial court found Larry was never a resident or domiciliary of Georgia, the state where he filed for dissolution, and his then-current residence of Illinois had no connection with either party. In the absence of proof Larry intended to remain in any of the states he had resided in, the trial court could presume that Larry was still a California domiciliary at the time the partition action was filed. (*Scoggins* v. *Pollock*, *supra*, 727 F.2d at p. 1027; *Sadat* v. *Mertes*, *supra*, 615 F.2d at p. 1181; *Gowins* v. *Gowins*, *supra*, 466 So.2d at p. 36.) Thus, I believe the record here could support a trial court ruling Larry was still legally domiciled in California when the partition action was filed.

Moreover, unlike the majority, I do not believe the briefing in this court prevents Nancy from pursuing a domiciliary theory. At trial, Nancy never conceded Larry's domicile was other than California. In *his* opening brief, Larry conceded application of *Miller* v. *Miller* (Cal.App.), and interpreted it as holding that personal jurisdiction is to be determined as of the date of separation. The Supreme Court, however, had already ordered the Reporter of Decisions not to publish the opinion in *Miller*. Nancy, nonetheless, accepted Larry's concession and argued that the parties were residents of California at the time of separation. In this context, her brief states: "[Appellant's] contention that he is not a resident nor domiciliary at the time the complaint for partition was filed, is correct. It is not certain though, whether appellant is a resident or domiciliary of the state of Michigan wherein he alleges he maintains his legal home of record; the state of [I]llinois, where he is currently located; or the state of Arkansas where his wife maintains her home."

Larry's willingness to accept *Miller,* Nancy's willingness to accept Larry's premise and the foregoing statement in Nancy's brief all suggest that neither party has considered the presumption of a continuing domicile and its role under FUSFSPA. This inadvertence is understandable in light of the parties' reliance upon Larry's interpretation of *Miller.* Indeed, having focused on circumstances which existed at the time of separation, all parties involved in this action, including Nancy and her counsel, like the court in *Tarvin,* seem to have ignored the distinction between domicile and residence

and unfortunately the issue of where Larry was actually legally domiciled at the time the partition action here was filed was simply not an express part of the argument or analysis at trial. Nor was the continuing domicile concept and its relationship to the facts of this case or FUSFSPA addressed below, or on appeal.

In prohibiting an examination of these questions at trial level here in California, we may effectively be excluding Nancy from access to the *only* forum which has proper jurisdiction over her partition action. Given the impact and significance of this possibility, and the confusing state of the law when this matter was first heard and then briefed, I cannot rely on the arguments presented at the time of this appeal.

In light of my concerns, I would grant the writ with instructions to the trial court that it determine Larry's domicile as of the date the partition action was filed and in so doing, consider the concept of continuing domicile and its application to FUSFSPA.